## CITY ICE & FUEL CO. v. BRIGHT.
### No. 6451.

Circuit Court of Appeals, Sixth Circuit.
Nov. 12, 1934.

B. M. Corwin, of Grand Rapids, Mich., and H. A. Spring, of Cleveland, Ohio (Corwin & Davidson, of Grand Rapids, Mich.; and Cannon, Spieth, Taggart, Spring & Annat, of Cleveland, Ohio, on the brief), for appellant.

D. G. Slawson, of Grand Rapids, Mich., and F. C. Sibley, of Detroit, Mich. (Knappen, Uhl, Bryant & Snow, of Grand Rapids, Mich., and Frank C. Sibley, of Detroit, Mich., on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and TAYLOR, District Judge.

HICKS, Circuit Judge.

Action for compensation for information and data furnished appellant and used by it as the basis for purchase of certain ice plants and businesses. The declaration was framed in two counts—the first alleging an express agreement for compensation; and the second based on a quantum meruit under the common counts of assumpsit. The bill of particulars accompanying the common counts was worded "for services, data, information relating to the ice companies referred to in the first count" (the special count) "of plaintiff's declaration furnished by plaintiff to defendant at defendant's request. * * *"

The answer denied that appellee had performed any services whereby the ice plants were placed on a basis for sale, admitted that appellant had received certain information from appellee, but denied that it was received in consideration of any promise to pay appellee or that the acquisition of the businesses was made on data furnished by appellee. There was a general denial of each of the common counts. An amendment to the answer set up the special defense that the agreement mentioned in the declaration was to pay a commission upon the sale of real estate and that neither said agreement nor note or memorandum thereof was in writing.

The court directed a verdict for defendant upon the count alleging an express agreement, but submitted the case to the jury upon the common counts, which found for appellee in the sum of $20,000 upon which judgment was entered; hence this appeal.

By exceptions to the denial of a directed verdict upon the common counts, and to the refusal of certain requests to charge, appellant has preserved the question whether there was any evidence to sustain the verdict.

There is substantial evidence that appellee, an experienced refrigerating engineer, in November, 1928, approached Joseph Horner, president and stockholder of the Consumers' Ice Company, a stockholder in the City Ice & Fuel Company (not the appellant) and in the Owosso Ice & Fuel Company, and a holder of shares in a voting trust in the Moon Lake Ice Company, relative to the sale of the four companies as a unit; that their discussions resulted in an agreement that appellee would attempt to secure a buyer for the four businesses at a price of $1,500,000.-00 cash, and that Horner would use his best efforts to obtain an option on the four companies for appellee should he obtain a prospective buyer; and that, as a basis for the sale of the four companies as one, it was necessary to work up a consolidated report showing their potential earning power as a unit, the expense of which was to be borne by appellee. Horner refused to spend any money on the report, though he did furnish appellee with audits of the individual companies which he used as a basis for eliminating "non-recurring items" and as a basis for tentative unitary set-up. Appellee made an appraisal of each of the properties, including buildings, machinery, and delivery equipment. This required him to make numerous trips to consult the principal officers of the companies as to a fair price of each in a workable consolidation. Appellee employed a Miss Schipper, an experienced employee of Horner, to check his work, and, after his preliminary compilations had been completed, he employed Lawrence Scudder & Co., public accountants, to go over the same ground and make a three-year combined audit of the four companies, setting them up as one to show their potential earning power as a unified corporation. Appellee testified that the work of Scudder & Co. was made necessary by the fact that the audits furnished him by Horner were made by three different auditing companies and compiled on different bases.

The final results appeared in a complete audit and report of the assets, liabilities, sales, and profits of each of the four companies separately and on a consolidated basis for the past three years. This audit is voluminous and presents a mass of detailed information.

On February 1, 1929, an agreement was entered into between Horner, William A. Voss, and L. C. Voss, as a committee, the Michigan Trust Company, and such stockholders of Moon Lake Ice Company, as should thereafter become parties thereto,

whereby three-fourths of the stock of the Moon Lake Company was put in escrow with the Trust Company for ninety days to facilitate reorganization and the sale of stockholders' interests. Agreements concededly similar were executed for the other three companies.

It is unnecessary to go into further detail concerning these agreements. Suffice it to say that they embody a plan whereby all the properties of the four companies with certain immaterial exceptions, might be readily sold for the aggregate price of $1,500,000. Appellee was not a party to these agreements. His only connection with them was that he was promised by Horner, an influential member of the negotiating committee set up under the escrow arrangement, that Horner would do his best to obtain for him an option to purchase provided appellee would produce a buyer. When appellee was unable to obtain a buyer in the ninety-day period ending May 1, 1929, the agreement through Horner's influence was extended seven months or until December 1st and appellee by oral promise was again favored thereunder.

Appellee endeavored to interest some bankers in Detroit, but it soon became apparent that the proposed sale to them would fall through. Thereafter appellee, who occasionally worked for appellant, one of the largest and most stable ice manufacturing companies in the country, with headquarters in Cleveland, happening to be there upon another matter, by chance showed Mr. J. M. Bluim, vice president and treasurer of the company, the earning statements for three years which he had compiled on the group of plants. He explained to Bluim "that the properties could be acquired for a million and a half; that it had to be cash and that I will have to get my fee added to that which would be 3%, and which made a total cash purchase price of $1,545,000.00."

Bluim became interested, and in the latter part of May, 1929, appellee returned to Cleveland by appointment with Bluim and in conference with him and H. D. Norvell, president of appellant, submitted the complete plan of sale. "I gave Mr. Bluim the capacities of all plants, the physical conditions of them and went over the details of the operations of the three-year period, showing that there was a slight increase in the sales each year, in the number of tons being sold, and that the profits were pretty regular and that while they were not the same each year they showed an average annual net income of some $170,000.00 which would make them attractive at the price of a million and a half.

I also submitted data showing the population of various towns, showed what the ice consumption was per capita for Grand Rapids, which is above the average for the United States; showed that Grand Rapids was an exceptionally good ice town even though it was located in a northerly climate, and I went at quite some length into figures. We then, as I remember it, went out to lunch and came back, and went into further details—as I recall I spent practically the entire afternoon there also."

He further testified: "I again mentioned the total cost to the defendant, a million and a half dollars, plus a 3% fee * * * plus the cost of operation since Dec. 1, 1928."

According to appellee, Bluim stated that the proposition looked very attractive, but on account of other matters they would not be able to act on it for some time. "He suggested that I leave the papers, the audit, with him and hold it over for several months and also that I don't offer or peddle it to some one outside and that he believed that they could give favorable consideration to the proposition. I left the audit with him. * * * "

Appellee testified that he retained his "work figures since Bluim had made memoranda of them." Appellee made no attempt to "peddle" the proposition to any one else, and his audit was never returned.

The matter was held in abeyance until September 24, 1929, when appellee wrote appellant suggesting that, if they were interested, he would like to hear from them. On September 27 Norvell wrote in reply, saying they were very busy and without time to consummate such a deal and suggesting that any hope of immediate action be dispelled. There is substantial evidence tending to show that there were no further negotiations between appellant and appellee.

In November, 1929, Horner broached the matter of a direct sale of the four plants to appellant when he met one of its officers at the National Ice Convention in Boston. This was followed by a visit to Cleveland and then by a letter dated November 22, 1929, from Horner to Bluim, pertinent portions of which follow: "I have interviewed the majority of our stockholders, especially the larger ones and the managers of the other companies have done likewise and I am authorized to say *they are willing to carry through the arrangements to sell the four concerns to you at the same price and under the conditions as arranged with Mr. George Bright, the only difference being that in your case they agree*

*to take the stock of your company instead of cash as in the first case."* (Italics ours.)

Horner testified that some time in December before the sale was consummated appellant made an appraisal of the properties. It did not make an audit, but the evidence tends to show that it used a copy of the audit made by appellee. Accepting appellee's audit as correct for the period it covered, Horner supplemented it with an audit for the period of January 1, 1929, which he himself provided. In answer to the question, "And the figures represented as appearing in Exhibit 1 which is the audit prepared by Mr. Bright were accepted by the City Ice and Fuel Company as the basis for this particular deal that you have negotiated in November, 1929?" he said: "I believe they were"; and "Q. You employed Scudder & Company for the extended audit because Scudder & Company had prepared the audit of Bright's? A. Largely."

The actual purchase upon which appellee bases his claim was consummated as the result of offers emanating from the four companies about the 1st of January, 1930, which were accepted by appellant by resolution of its board of directors in March, 1930. The consideration was $1,350,000 paid in stock of appellant instead of $1,500,000 cash as proposed by appellee. Otherwise the information and plan worked out by appellee were the basis of the transaction.

We conclude that the evidence hereinabove detailed supports the verdict. There was of course countervailing testimony, but we are not concerned therewith upon a motion to direct a verdict. There is uncontroverted evidence that appellant recognized the merit of the plan and data which it obtained from appellee. With the exception of the appraisal and later the audit, which brought appellee's data up to date, there is ample evidence from which the jury might conclude that appellant was making full use of the information furnished by appellee.

■ The law will imply a contract from the circumstances. See Klebe v. U. S., 263 U. S. 188, 192, 44 S. Ct. 58, 68 L. Ed. 244. The acceptance by appellant of the information and data furnished by appellee is a sufficient consideration to support an implied promise to pay therefor. Appellant understood that appellee expected compensation if it should acquire the properties. Indeed appellant offered to defray his expenses incurred in the prosecution of the work. The absence of an express agreement does not preclude the jury from considering under the common counts the value of the data which appellant unquestionably sought and used. Appellant cannot escape liability under such an excuse, nor force appellee to accept its own valuation of his services.

■ As was said in an opinion written by Judge (later Mr. Justice) Holmes in Spencer v. Spencer, 181 Mass. 471, 473, 63 N. E. 947, 948: "Again, it is not necessary that the defendant should have believed that the plaintiff expected pay. If as a reasonable man he should have understood from what he knew that such was the expectation, he would be bound by accepting the services."

In Miller v. Stevens, 224 Mich. 626, 632, 195 N. W. 481, 482, it is said: " * * * Where there is no express contract a contract may, be implied in fact, where one engages or accepts beneficial services of another for which compensation is customarily made and naturally anticipated, and, although there be no express stipulation between the parties for wages or price, the law implies an understanding or intent to pay the value of the services rendered. * * * "

In Page on Contracts, Vol. 3 (2d Ed.) § 1442, it is said: "If services are rendered at the request of the person for whom they are rendered *or if the benefits thereof are accepted voluntarily by such person* there is an implied promise on his part to make reasonable compensation therefor if no express contract has been made; if the services are such as are ordinarily paid for and if the party who rendered them was not bound to render them without compensation." (Italics ours.)

See, also, Orcutt v. White, 220 Mich. 590, 190 N. W. 660.

■ Complaint is made in appellant's brief that the reference in the bill of particulars supporting the common counts was to the allegations of the special count and hence no evidence except that relating to an express agreement could properly have been offered. We do not so read the bill of particulars. The reference therein was to the ice companies mentioned in the first count, but, if appellant was surprised, it lost its right to object since it entered no demand to make the common counts more specific. Freehling v. Ketchum, 39 Mich. 299.

■ Appellant urges that it was entitled to a directed verdict upon the common counts because, as indicated herein, the negotiations between the parties took place in Cleveland, Ohio, and there was no written agreement

to pay a commission for the sale of real estate as required by the Statute of Frauds of Ohio. Appellee points out that by an amendment to the Ohio Statute of Frauds made in 1925 (Act Ohio April 9, 1925, 111 Ohio Laws, p. 104) agreements for the payment of commission upon the sale of real estate are taken out of the statute. However we do not regard the Statute of Frauds as operative. We think the District Judge correctly pointed out that appellee's suit was not one for commission upon the sale of real estate.

We have examined the assignments of error not herein particularly discussed, and we find nothing therein prejudicial to the rights of appellant.

The judgment of the District Court is affirmed.